No. 16-50519

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————————

DAVID CRUZ; VALENTIN REYES; JONATHAN RYAN; BISHOP ENRIQUE
SAN PEDRO OZANAM CENTER, INCORPORATED,

*Plaintiffs-Appellees*,

v.

GREG ABBOTT, In his Official Capacity as Governor of the State of Texas;
STEVEN C. MCCRAW, In his Official Capacity as Director of Public Safety;
CYNTHIA LEON, In her Official Capacity as Member of the Texas Public Safety
Commission, also known as Cindy; FAITH JOHNSON, In her Official Capacity as
Member of the Texas Public Safety Commission; MANNY FLORES, in his
Official Capacity as Member of the Texas Public Safety Commission; STEVEN P.
MACH, In his Official Capacity as Member of the Texas Public Safety
Commission; RANDY WATSON, In his Official Capacity as Member of the
Texas Public Safety Commission,

*Defendants-Appellants.*

————————————————

On Appeal from the United States District Court for the Western District of Texas,
San Antonio Division, No. 5:16-cv-67, Judge David A. Ezra

————————————————

## BRIEF FOR APPELLEES
————————————————

NINA PERALES
MARISA BONO
JACK SALMON
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway St., Ste. 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
*Counsel for Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees | Former or present counsel |
|---|---|
| <ul><li>David Cruz</li><li>Valentin Reyes</li><li>Jonathan Ryan</li><li>Bishop Enrique San Pedro Ozanam Center, Incorporated</li></ul> | <ul><li>Nina Perales</li><li>Marisa Bono</li><li>John Paul (Jack) Salmon</li></ul> |
| **Defendants-Appellants** | **Former or present counsel** |
| <ul><li>Greg Abbott, in his official capacity as Governor of Texas</li><li>Steven C. McCraw, in his official capacity as Director of Public Safety</li><li>Cynthia Leon, in her official capacity as Member of the Texas Public Safety Commission, also known as Cindy</li><li>Faith Johnson, in her official capacity as Member of the Texas Public Safety Commission</li><li>Manny Flores, in his official capacity as Member of the Texas Public Safety Commission</li><li>Steven P. Mach, in his official capacity as Member of the Texas</li></ul> | <ul><li>Ken Paxton</li><li>Jeffrey C. Mateer</li><li>Scott A. Keller</li><li>Matthew H. Frederick</li><li>Adam N. Bitter</li><li>Angela V. Colmenero</li><li>John Earl Duke</li></ul> |

i

| | |
|---|---|
| Public Safety Commission<br>• Randy Watson, in his official capacity as Member of the Texas Public Safety Commission | |

The undersigned counsel of record further certifies that Plaintiff-Appellee Bishop Enrique San Pedro Ozanam Center, Incorporated does not have a parent corporation or any subsidiaries. Bishop Enrique San Pedro Ozanam Center, Incorporated does not issue stock, and therefore no publicly held corporation owns 10% or more of its stock.

*/s/ Nina Perales*
Nina Perales
*Attorney of Record for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted in this case because it raises complex issues of preemption under the U.S. Constitution.  This case is also situated in a context of decisions by other Circuit Courts of Appeals addressing similar attempts by states to criminalize immigrant harboring.  Oral argument will assist the Court in analyzing preemption and related issues.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF AUTHORITIES ................................................................... vii

ISSUES PRESENTED..........................................................................1

STATEMENT OF THE CASE..................................................................1

I.    Texas House Bill 11 and Its Immigrant Harboring
      Provisions ............................................................................2

II.   The Immigrant Harboring Provisions Created
      New Criminal Offenses ............................................................5

III.  DPS has Moved to Enforce HB 11 ..............................................7

IV.   Plaintiffs...............................................................................9

V.    Procedural History .................................................................10

SUMMARY OF THE ARGUMENT .......................................................12

ARGUMENT ...................................................................................14

I.    Plaintiffs Have Established Injury-in-Fact ..................................14

      A.    Defendants' arguments regarding injury-in-fact
            have shifted over the course of this litigation .....................16

      B.    Plaintiffs' conduct is proscribed by HB 11 .........................17

            1.    Plaintiffs' actions fall within the plain meaning

of the phrase "concealing, harboring, or shielding . . . from detection.".............................17

2.    *The scope of HB 11is not confined by federal law* .................22

3.    *HB 11 does not exempt shelters from liability for immigrant harboring* ........................................25

C.    Plaintiffs face the credible threat of prosecution................................29

1.    *Plaintiffs Cruz and Reyes face the credible threat of prosecution* ................................................30

2.    *Plaintiffs Ryan and the Ozanam Center face the credible threat of prosecution* .....................................31

3.    *Plaintiffs have to take significant and costly compliance measures or risk criminal prosecution* ..................................................................32

D.    Defendant McCraw's affidavit does not alter the scope of HB 11 and does not diminish the threat of enforcement ..................................................34

II.    Plaintiffs Have Established Traceability and Redressability as to Defendant Abbott ..........................................37

III.    Plaintiffs Have an Equitable Right of Action...............................................42

IV.    Federal Law Preempts HB 11's Harboring Provisions ................................46

A.    HB 11 § 14(a)(2) is conflict preempted ..............................................47

1.    *Section 14(a)(2) conflicts with federal alien harboring law by relocating decisionmaking* .........................48

2.    *Section 14(a)(2) conflicts with federal alien harboring law with respect to penalties* .....................................50

   *3. Section 14(a)(2) conflicts with the scope*
    *of federal alien harboring law* ...................................................51

  B. Section 14(a)(2) is field preempted ....................................................52

   *1. Congress intended to preempt state alien*
    *harboring laws through a complete,*
    *harmonious set of standards sanctioning*
    *individuals who harbor certain aliens* ......................................53

   *2. The federal government has a dominant*
    *interest in the field of alien harboring*
    *that precludes enforcement of state alien*
    *harboring laws* ..........................................................................58

  C. Sections 15(a) and 16(a)(17) are preempted to the
   extent they incorporate § 14(a)(2) ......................................................60

V. The District Court Acted Within Its Discretion When
 It Entered a Preliminary Injunction ................................................................61

CONCLUSION .......................................................................................................63

CERTIFICATE OF SERVICE .................................................................................64

CERTIFICATE OF COMPLIANCE .........................................................................65

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Am. Sch. of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902)................................................................................43

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    133 S. Ct. 2247 (2013)........................................................................43

*Arizona v. United States*, 132 S. Ct. 2492 (2012)............................................passim

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015)..............................................................42, 43, 44, 45

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979).................................................passim

*Carroll v. Safford*, 44 U.S. 441 (1845) ...........................................................42, 44

*Chamber of Commerce of the U.S. v. Whiting,*
131 S. Ct. 1968 (2011) ...........................................................................56

*City of Dallas v. Abbot*, 304 S.W.3d 380 (Tex. 2010)...........................................35

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)....................42, 47, 50

*DeCanas v. Bica*, 424 U.S. 351 (1976)................................................................49

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328
    (Former 5th Cir. Unit B Nov. 1981).......................................................61, 63

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ......................................................61

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................62

*Ex parte Young*, 209 U.S. 123 (1908)............................................................37, 43

*Fitts v. McGhee*, 172 U.S. 516 (1899) ................................................................40

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.,*

996 S.W.2d 864 (Tex. 1999) ........................................................18

*Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272 (5th Cir. 2015)....................18, 22, 23

*Ga. Latino Alliance for Human Rights v. Governor of Ga.*,
    691 F.3d 1250 (11th Cir. 2012) ..................................... 32, 54, 56, 57, 58, 62

*Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000)....................................51

*Heimann v. Nat'l Elevator Indus. Pension Fund*,
    187 F.3d 493 (5th Cir. 1999) ........................................................62

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ........................................................passim

*Houston Chronicle Pub. Co. v. City of League City, Tex.*,
    488 F.3d 613 (5th Cir. 2007) ........................................................ 14

*Int'l Soc'y for Krishna Consciousness v. Eaves*,
    601 F.2d 809 (5th Cir. 1979) ........................................................30

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ....................................................61

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ................................................37, 41

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
    242 S.W.3d 1 (Tex. 2007) ........................................................20

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................................41

*Lohr v. Medtronic*, 518 U.S. 470 (1996) ................................................................45

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ...........................................42

*Lozano v. City of Hazleton*, 724 F.3d 297 (3rd Cir. 2013) ..............................57, 58

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ...................................15

*Miss. State Democratic Party v. Barbour*,

529 F.3d 538 (5th Cir. 2008) .......................................................30

*N.A.A.C.P. v. City of Kyle, Tex.*,
626 F.3d 233 (5th Cir. 2010) .......................................................15

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) ...........................passim

*Pennell v. City of San Jose*, 485 U.S. 1 (1988)................................30

*Planned Parenthood of Houston & Se. Tex. v. Sanchez*,
403 F.3d 324 (5th Cir. 2005) .......................................................42

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ...........................52

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) .................................42

*Steffel v. Thompson*, 415 U.S. 452 (1974) ............................................15

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014)..........................passim

*Terrebonne Parish NAACP v. Jindal*,
No. 14-069-JJB-SCR, 2015 WL 8346468,
(M.D. La. Dec. 8, 2015) ...............................................................37

*Tex. Lottery Comm'n v. First State Bank of DeQueen*,
325 S.W.3d 628 (Tex. 2010) .......................................................17

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*,
608 F.3d 200 (5th Cir. 2010) .......................................................62

*Trans World Airlines, Inc. v. Mattox*,
897 F.2d 773 (5th Cir. 1990) .......................................................62

*United States v. Acosta de Evans*,
531 F.2d 428 (9th Cir. 1976) .......................................................24

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ...............................................57, 63

ix

*United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012).........................................24

*United States v. Rubio–Gonzalez*, 674 F.2d 1067 (5th Cir. 1982) ...................24, 53

*United States v. Shum*, 496 F.3d 390 (5th Cir. 2007) ............................................. 25

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) .......................passim

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ...........................passim

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
    726 F.3d 524 (5th Cir. 2013) .................................................................passim

*Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383 (1988) .........................passim

*VRC LLC v. City of Dallas*, 460 F.3d 607 (5th Cir. 2006) ......................................62

*Wright v. Ford Motor Co.,* 508 F.3d 263 (5th Cir.2007)...................................18, 22

## CONSTITUTIONS, STATUTES, AND RULES

U.S. Const., art. I, § 8, cl. 4.........................................................................................

U.S. Const. art. VI, cl. 2 .............................................................................................

8 U.S.C.
    § 1101 ...........................................................................................................26
    § 1182 ...........................................................................................................55
    § 1324(a)..................................................................................................passim
    § 1324(a)(1)(A)(i)........................................................................................53
    § 1324(a)(1)(A)(ii).......................................................................................53
    1324(a)(1)(A)(iii)....................................................................................passim
    § 1324(a)(1)(A)(iv)................................................................................48, 54
    § 1324(a)(1)(B).......................................................................................48, 51
    § 1324(a)(1)(C).......................................................................................51, 54
    § 1324(a)(2) ...............................................................................................54
    § 1324(a)(3) ...............................................................................................54

§ 1324(c) ...................................................................................54
§ 1324(d) ...................................................................................54
§ 1324(e) ...................................................................................54
§ 1325 .........................................................................................55
§ 1326 .........................................................................................55
§ 1329 .........................................................................................56
§ 1621 .........................................................................................55
§ 3231 .........................................................................................56

HB 11
§ 14(a)(1) ...........................................................................passim
§ 14(a)(2) ...........................................................................passim
§ 14(c) ........................................................................................52
§ 15(a) ...........................................................................6, 60, 61
§ 16(a)(17) ....................................................................6, 60, 61

Tex. Penal Code
§ 6.03(b) ....................................................................................16
§ 12.34 ........................................................................................51
§ 20.05(a)(2) ..........................................................................5, 35
§ 20.06(a) .....................................................................................6
§ 71.02(a) .....................................................................................6

Tex. Gov't Code
§ 402.042 ...................................................................................35
§ 411.003(b) ........................................................................36, 38
§ 411.003(d) ..............................................................................38
§ 411.004(5) ..............................................................................38
§ 411.005(a) ..............................................................................36
§ 411.006(a) ..............................................................................37
§ 411.006(8) ..............................................................................38
§ 411.012 ....................................................................................38
§ 411.023 ....................................................................................38
§ 411.0036(c) ............................................................................38
§ 411.0075(c) ............................................................................38
§ 411.0096(a) ............................................................................38
§ 411.0096(b)(2) .......................................................................38
§ 437.001(14) ............................................................................40

§ 437.002 ......................................................................................................40

§ 772.006 ......................................................................................................38

**OTHER AUTHORITIES**

HB 260 § 2, 82nd Leg. R.S. (2011) ...........................................................6

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 225(a), 122 Stat. 5044, 5072 (2008), codified at 22 U.S.C. § 7101....................................................................................................45

*Webster's New World College Dictionary* (4th Ed. 1999) .........................18, 19, 21

## ISSUES PRESENTED

1.      Whether Plaintiffs established Article III injury-in-fact sufficient to establish standing.

2.      Whether Plaintiffs established Article III traceability and redressability as to Defendant Governor Abbott.

3.      Whether Plaintiffs may challenge a state statute as federally preempted under the Supremacy Clause of the U.S. Constitution.

4.      Whether, following invalidation of similar statutes under the Supremacy Clause by five Circuit Courts of Appeals, the district court correctly concluded that Plaintiffs are likely to succeed on their Supremacy Clause preemption challenge.

5.      Whether the district court abused its discretion by granting a preliminary injunction.

## STATEMENT OF THE CASE

In 2015, Texas enacted its immigrant harboring statute to "fill the gap where the federal government is not meeting [its] core responsibilities" and to "empower our law enforcement officials to protect our citizens[.]"  ROA.310–11.  The Texas immigrant harboring statute substantially mirrors the federal statute, 8 U.S.C. § 1 324(a)(l)(A)(iii) and (iv), but places responsibility for prosecuting and adjudicating

immigrant harboring cases in the hands of local law enforcement officers, prosecutors, and judges.

The Texas Legislature's adoption of its immigrant harboring statute followed passage of immigrant harboring statutes in Arizona, Alabama, Georgia, Pennsylvania, and South Carolina. All of those statutes were invalidated on preemption grounds by federal Courts of Appeals in 2012 and 2013. Also in 2013, this Court, in an *en banc* decision, invalidated, on preemption grounds, an immigrant harboring ordinance adopted by the City of Farmers Branch, Texas. Despite the complete failure of other states' attempts to criminalize immigrant harboring, Texas forged ahead with its own statute. As explained by Defendant Governor Greg Abbott in his bill signing statement: "Texas will not sit idly by while the federal government fails to do its job and secure the border." ROA.336.

## I.   Texas House Bill 11 and Its Immigrant Harboring Provisions.

The Texas immigrant harboring statute is one portion of 2015 House Bill ("HB") 11. HB 11, 84th Leg. R.S. (2015). HB 11 was introduced in the Texas House of Representatives on March 2, 2015.[1] In the House floor debate on HB 11, the bill's sponsor, State Representative Dennis Bonnen, stated:

---

[1]*See*
http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=84R&Bill=HB11

2

> Texas is taking bold steps to fill the gap where the federal government is not meeting their core responsibilities . . . What this bill helps also do is empower our law enforcement officials to protect our citizens more due to the failure of that federal government in doing their constitutional responsibility.

ROA.310–11.

In the legislative hearings on HB 11, multiple witnesses testified that HB 11's immigrant harboring provisions were preempted by federal law and would not withstand constitutional challenge.[2]  For example, Representative Walle expressed concern that HB 11's harboring provisions, as written, would be preempted by federal law.  ROA.1900–01.  Representative Walle offered an amendment to add the following language to HB 11:   "For purposes of Subsection (a)(2), a determination of whether an individual's presence in this county violates federal law may be made only by a federal agency authorized to make such a determination."  Tabled Amendment 23, HB 11, 84th Leg., R.S. (2015).[3]  HB 11's

---

[2] Video of legislative hearings are available at the following links:  Tex. House of Representatives,  Homeland Security & Public Safety Hearings, Mar. 11, 2015,   http://www.house.state.tx.us/video-audio/committee-broadcasts/84/;   Tex. Senate,  Subcommittee  on  Border  Security  Hearing,  Mar.  16,  2015, http://www.senate.state.tx.us/avarchive/?yr=2015; Tex. Senate, Committee on Veterans  Affairs  &  Military  Installations  Hearing,  Mar.  18,  2015, http://www.senate.state.tx.us/avarchive/?yr=2015.

[3] Available at http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=84R&Bill=HB11.

3

House sponsor, Representative Bonnen, moved to table the amendment, arguing that the amendment would make it more difficult for the Texas Department of Public Safety ("DPS") and local law enforcement to enforce the harboring provision. ROA.1904. The amendment was tabled by a 110-32 vote of the House members. ROA.1905.

Other members of the Legislature expressed concern that the immigrant harboring provisions would sweep in the conduct of individuals providing charitable services. For example, Representative Farias introduced an amendment exempting humanitarian workers from criminal liability for immigrant harboring. HB 11's House sponsor, Representative Bonnen, successfully moved to table the amendment, arguing that "if Mr. Farias' amendment went on this bill, I think every individual that was up on charges of smuggling would hire one of our talented friends out here if they were willing and with Mr. Farias' language, they would all become refugees and they would all get off." ROA.1906–07.

Other amendments intended to narrow the scope of the immigrant harboring provisions to individuals acting pursuant to organized criminal activity or receiving a pecuniary benefit greater than $500 were similarly defeated by the bill's sponsor who argued that the amendments would hinder law enforcement's ability to address smuggling issues and would raise the standard of proof too high. *See*

4

Tabled Amendment 22, H.B. 11, 84th Leg., R.S. (2015); Tabled Amendment 21, H.B. 11, 84th Leg., R.S. (2015); ROA.1894–1897; ROA.1898–1900.

Despite the concerns regarding the provisions' broad scope and possible preemption, HB 11, which was a priority bill for legislative leadership in the 2015 Legislative Session, passed the Texas House and Senate without removal of the immigrant harboring provisions. When the Texas Legislature sent HB 11 to the Governor for his signature, Representative Bonnen declared, "We are going to step forward where Washington fails." ROA.264.

On June 9, 2015, Defendant Governor Abbott signed HB 11 into law. In his signing statement, Governor Abbott stated: "Texas will not sit idly by while the federal government fails to do its job and secure the border." ROA.336. The Governor commented further to the media:

> The issues exist in the first place because we have a failed federal government that has refused to address the issues to tackle those problems . . . Those are national, federal-based issues that we demand the United States federal government address and solve. Texas is doing what it can do by passing this border security plan.

ROA.340. HB 11 became effective on September 1, 2015. *See* HB 11 § 22.

## II.    The Immigrant Harboring Provisions Created New Criminal Offenses.

HB 11 § 14(a)(2) created the following criminal offense, codified at Texas Penal Code § 20.05(a)(2):

> (a) A person commits an offense if the person<u>, with the intent to obtain a pecuniary benefit,</u> knowingly . . . <u>(2)</u> encourages or induces a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection."[4]

HB 11 also created the new offense of continuous harboring:

> <u>A person commits an offense if, during a period that is 10 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20.05.</u>

*See* HB 11 § 15(a), codified at Tex. Penal Code § 20.06(a).

HB 11 made the new offenses of immigrant harboring and continuous immigrant harboring eligible for prosecution as organized criminal activity:

> A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following:  . . . any offense under Section 20.05 <u>or 20.06</u>[.]

*See* HB 11 § 16(a)(17), codified at Tex. Penal Code § 71.02(a).   Plaintiffs challenge HB 11 §§ 14(a), 15(a), and 16(a)(17), referred to collectively as HB 11's harboring provisions.

Aside from the challenged immigrant harboring provisions, HB 11 is largely devoted to providing support to local law enforcement in the form of data collection, training, and assistance with detention and prosecution.  For example,

---

[4] Strikethroughs indicate deletions from the previous version of Texas Penal Code § 20.05, and underlines indicate additions.  *See* HB 11 § 14; *see also* HB 260 § 2, 82nd Leg. R.S. (2011); ROA.237.

HB 11 includes, among other things: the creation of a transnational and organized crime division in Texas "to address matters related to border security and organized crime" and provide the support of the Texas Attorney General's office to local prosecutors, HB 11 § 4; the creation of the Texas Transnational Intelligence Center to collect intelligence on border crime and cross-border crime, *id.* § 13; a requirement that DPS provide assistance to federal and local law enforcement authorities working at international checkpoints to find weapons, contraband, and people being smuggled across the border, *id.* § 9; and the creation of an interim joint legislative committee to study border security, *id.* § 17.

## III. DPS Has Moved to Enforce HB 11.

On December 10, 2015, the Texas Legislature's House Committee on State Affairs met to examine "state and local laws applicable to undocumented immigrants throughout the State of Texas[.]" ROA.342. At the hearing, Texas Deputy Attorney General Brantley Starr testified to legislators that although the U.S. Supreme Court had ruled that the federal government has authority over immigration, "[y]ou do have the ability to create state-level offenses that have an immigration element to them as long as they are sufficiently unique." ROA.345; ROA.976–77. Mr. Starr cited the criminal offenses in HB 11 as an example of permissible state law-making in the area of immigration. ROA.345; ROA.977.

7

Mr. Starr further testified that DPS had enforced the harboring provisions of HB 11. ROA.345; ROA.979–80. Mr. Starr explained that, because of the availability of the harboring provisions of HB 11, state troopers could make the arrests, and the local district attorney could prosecute, even if the U.S. Border Patrol and U.S. Attorney's Office declined the case. ROA.345–46; ROA.614; ROA.979–80.

On December 15, 2015, Defendant Governor Abbott announced the award of grants totaling $4.2 million to the Border Prosecution Unit. ROA.351. Defendant Governor Abbott stated: "This action would not be necessary if the federal government fulfilled its obligation to secure our nation's border . . . My first and foremost responsibility as Governor is to protect the citizens of Texas, with or without the federal government's help." ROA.353.

On January 21, 2016, DPS Director Defendant Steven C. McCraw testified before the Texas Legislature's interim Joint Committee on Border Security. When asked a question about preparations of DPS to enforce HB 11, Defendant McCraw stated "we've trained . . . [and] we've educated on it." ROA.1127.[5]

---

[5] Video available at http://www.house.state.tx.us/video-audio/committee-broadcasts/84/.

8

## IV.    Plaintiffs.

Plaintiffs David Cruz and Valentin Reyes are property owners who have rented to undocumented immigrants and intend to rent to undocumented immigrants in the future. ROA.1793–94; ROA.1801–1803.

Plaintiff Jonathan Ryan is the Executive Director of the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). ROA.356. RAICES provides free and low-cost legal services to underserved immigrant children, families, and refugees in Central and South Texas. ROA.356. RAICES also operates Casa RAICES and La Casita, temporary shelters that provide safe post-release services to immigrants leaving detention centers. ROA.356.

Plaintiff Bishop Enrique San Pedro Ozanam Center, Inc. (the Ozanam Center or the Center) is a homeless shelter in Brownsville, Texas. ROA.1810. The Ozanam Center provides temporary shelter and transitional housing to individuals and families, regardless of sex, race, color, creed, national origin, and immigration status. ROA.1810. The Center provides a clean, safe place to stay, hot meals, case-management services, and local transportation, among other services. ROA.1810–14. The Center can house and feed up to 200 guests per night. ROA.1810.

9

At both RAICES and the Ozanam Center, shelter residents contribute to the operation of the shelters by helping to clean, sweep the floors, make beds, wash laundry and take out the trash.  ROA.537; ROA.1811; ROA.1814.

## V.    Procedural History.

On January 24, 2016, Plaintiffs filed suit challenging HB 11's harboring provisions as preempted by federal immigration law under the Supremacy Clause. ROA.14; ROA.426.  Plaintiffs also challenged the provisions on grounds that they violate the Due Process Clause and Equal Protection Clause of the 14th Amendment.  ROA.427.  Plaintiffs moved for a preliminary injunction.  ROA.196. Defendants opposed the motion for preliminary injunction and also moved to dismiss the complaint for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim on which relief may be granted under Rule 12(b)(6).  ROA.458.

The district court held a hearing on Plaintiffs' motion for preliminary injunction and the parties stipulated that Plaintiffs' motion for preliminary injunction and Defendants' motion to dismiss would proceed on the evidentiary record comprised of the written materials submitted by the parties in support of their motions.  ROA.2064.

At the hearing, the district court asked Defendants for an unequivocal answer from the Texas Attorney General as to whether any of the Plaintiffs'

10

conduct fell within the ambit of the state immigrant harboring provisions. ROA.2374–78; ROA.2105.   The district court asked the Attorney General to clarify whether the challenged statute made any distinction between an individual, on the one hand, who charges money to rent or provide a hotel room to individuals that the proprietor knows are undocumented, and an individual, on the other hand, "who's running a safe house as part of a criminal organization [after a] coyote brings them across[.]"  ROA.2373–76.  Defendants did not provide an answer from the Attorney General.  Instead, Defendant McCraw stated in a filed declaration that "DPS officials" would not engage in enforcement activity under the immigrant harboring provisions against individuals engaged in conduct similar to Plaintiffs' conduct.  ROA.2071.

The district court granted Defendants' motion to dismiss in part, dismissing Plaintiffs' due process and equal protection claims under Rule 12(b)(6). ROA.2129–35.  The district court denied Defendants' motion in all other respects. ROA.2137.   The district court also granted a preliminary injunction, enjoining enforcement of HB 11's harboring provisions.  ROA.2137.  The district court determined that Plaintiffs had standing, were likely to succeed on their preemption challenge, and satisfied the other preliminary injunction elements.  ROA.2137. Defendants filed their notice of interlocutory appeal on May 13, 2016.  ROA.2174.

11

On June 2, 2016, the district court granted Defendants' motion to stay further proceedings on the merits pending final disposition of this interlocutory appeal. ROA.2320.

## SUMMARY OF THE ARGUMENT

Plaintiffs have suffered Article III injury-in-fact because they engage in conduct proscribed by the plain language of Texas's harboring statute and there exists a credible threat of prosecution thereunder. Plaintiffs knowingly lease to and shelter undocumented individuals and families for money or in-kind assistance. Plaintiffs do not evict undocumented immigrants or report undocumented status to authorities. Further, Plaintiffs Ryan and the Ozanam Center facilitate the continued residence of undocumented immigrants in Texas by providing transportation, donations of food and clothing, referrals to social services, school enrollment assistance, and access to employment for their shelter residents. The Texas Legislature intended to criminalize Plaintiffs' activities and actually did so. Defendant McCraw cannot alter the scope of Texas law, and has not directed DPS officers—let alone local police and district attorneys—to refrain from investigating and arresting landlords and shelter employees for immigrant harboring. Plaintiffs pursue their activities under the shadow of prosecution and must undertake burdensome and costly measures to comply with the law.

12

Plaintiffs have established Article III traceability and redressability as to Defendant Governor Abbott because Governor Abbott has a direct role in the enforcement of the Texas immigrant harboring law and has actually exercised his authority. Governor Abbott appoints law enforcement officers and has a special duty to award grants to implement the harboring provisions. As he has touted, Governor Abbott has deployed National Guard troops to South Texas and assisted the Texas Border Prosecution Unit in prosecuting border crimes.

Plaintiffs pursue their Supremacy Clause preemption challenge through a centuries-old equitable right of action to enjoin unconstitutional state or federal action. This equitable cause of action includes, but is broader than, a claim under *Ex Parte Young*. The U.S. Supreme Court and the Fifth Circuit have reaffirmed this equitable claim explicitly and through recent decisions holding state laws preempted in private actions.

The district court acted within its discretion in issuing a preliminary injunction. As this Court has made clear, conflict is imminent when state actors attempt to enforce immigrant harboring law through state laws and in state courts. HB 11's immigrant harboring provisions relocate decisionmaking from federal actors to state actors, impose inconsistent penalties with respect to federal law, and widen and narrow the scope of criminalized conduct compared to federal

13

immigrant harboring law.   In addition, Texas's immigrant harboring provisions impermissibly regulate in a field wholly occupied by Congress, as the district court and the Third, Fourth, Ninth, and Eleventh Circuits have recognized.

The district court acted within its discretion in finding irreparable harm to Plaintiffs, who face criminal sanctions absent an injunction prohibiting Defendants' continued enforcement of the state harboring provisions.  The district court appropriately found that enjoining Texas's unconstitutional harboring provisions is in the public's interest and that the balance of equities tips in favor of Plaintiffs.

## ARGUMENT

## I.    Plaintiffs Have Established Injury-in-Fact.

The district court correctly concluded that Plaintiffs established the injury-in-fact requirement of standing.  The Article III component of the standing doctrine requires only that a plaintiff demonstrate the following three elements:  (1) an "injury in fact;" (2) that the injury is fairly traceable to the defendant's conduct; and (3) a likelihood that a favorable decision will redress the injury.  *Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 617 (5th Cir. 2007). Defendants have not challenged the traceability and redressability requirements for Article III standing, except as to Defendant Governor Abbott, which is discussed in

14

section II.  This court reviews the district court's findings of fact for clear error and its conclusions of law and standing *de novo*.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 236 (5th Cir. 2010).

"[A] plaintiff satisfies the injury-in-fact requirement [for Article III standing] where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  A plaintiff need not have engaged in the act targeted by a statute in order to challenge that statute as unconstitutional.  *Susan B. Anthony List*, 134 S. Ct. at 2342 ("When an individual is subject to [threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat").

15

## A.    Defendants' arguments regarding injury-in-fact have shifted over the course of this litigation.

Defendants contend on appeal that Plaintiffs cannot satisfy the injury-in-fact requirement for standing because "Plaintiffs face no credible threat of prosecution because their conduct does not violate the statute."  Appellants' Br. 17. Defendants have abandoned arguments they initially pursued in the district court. Defendants asserted in their trial-court motion to dismiss that Plaintiffs Cruz and Reyes do not have standing because they lack the requisite *mens rea* of "knowingly." ROA.479.  The district court rejected Defendants' argument because Plaintiffs Cruz and Reyes established that they acted "knowingly" within the meaning of that term under Texas Penal Code § 6.03(b).  ROA.2095.  Likewise, Defendants argued in their motion to dismiss that Plaintiffs Ryan and the Ozanam Center do not have standing because they do not commit the *actus reus* "with the intent to obtain a pecuniary benefit."  ROA.479. The district court rejected Defendants' argument because Plaintiffs Ryan and the Ozanam Center established that they have a pecuniary interest in the continued sheltering of undocumented individuals.  ROA.2102.  On appeal, Defendants argue that Plaintiffs Ryan and the Ozanam Center do not have standing because their activities do not come within the statutory phrase "concealing, harboring, or shielding . . from detection." Appellants' Br. 18.  Defendants also argue, consistent with their motion to dismiss,

16

that Plaintiffs have not established an imminent threat of prosecution under HB 11. ROA.481; Appellants' Br. 22.

Defendants' numerous and shifting arguments are all unmeritorious. Defendants' arguments regarding the limited scope of HB 11 and Plaintiffs' credible threat of prosecution ignore the plain language of HB 11, the relevant standards of Texas statutory construction, the requirements for Article III standing, and the facts in the record.

### B.    Plaintiffs' conduct is proscribed by HB 11.

The relevant inquiry regarding the scope of a statute is whether a plaintiff's conduct is "arguably . . . proscribed by [the] statute" it wishes to challenge. *Susan B. Anthony List*, 134 S. Ct. at 2344 (quoting *Babbitt*, 442 U.S. at 298). Because the statute criminalizes knowingly providing shelter to undocumented immigrants and receiving a pecuniary benefit, Plaintiffs easily satisfy this standard.

#### 1.    *Plaintiffs' actions fall within the plain meaning of the phrase "concealing, harboring, or shielding . . . from detection."*

Plaintiffs' actions come within the plain meaning of the phrase "concealing, harboring, or shielding . . . from detection" stated in HB 11 § 14(a)(2). In construing Texas statutes, the primary objective is to give effect to the Legislature's intent. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). To do so, a court must start with its plain meaning.

17

*See Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 277 (5th Cir. 2015).  As the Fifth Circuit has stated:

> Texas courts highlight the primacy of a statute's plain meaning. "When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute." *Wright v. Ford Motor Co.,* 508 F.3d 263, 269 (5th Cir. 2007).  The Texas Supreme Court has stressed that "stray[ing] from the plain language of a statute . . . risk[s] encroaching on the Legislature's function to decide what the law should be." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999).

*Id.*

The Webster's New World College Dictionary (4th Ed. 1999) defines "conceal," "harbor," "shield," and "detection" as follows:

conceal:     **1**  to put out of sight; hide  **2**  to keep from another's knowledge; keep secret

harbor:     **1**  to serve as, or provide, a place of protection to; shelter or house; conceal or hide  **2**  to be the dwelling place or habitat of  **3**  to hold in the mind; cling to

shield:     **1**  to be or provide a shield for; defend; protect; guard  **2**  to hide from view; screen

detection:     **1**  a finding out or being found out: said esp. of what tends to elude notice  **2**  DEMODULATION[6]

---

[6] "Demodulation" is defined as:  "*Radio* the process of recovering at the receiver a signal that has been modulated on a carrier wave; detection."

Courts interpreting a Texas statute "presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind." *Tex. Lottery Comm'n*, 325 S.W.3d at 635.  The words "conceal," "harbor," and "shield" overlap to some degree; however, each word connotes additional actions not shared by the others.

The activities of Plaintiffs Cruz and Reyes, as landlords, and Plaintiffs Ryan and the Ozanam Center, as a shelter and a shelter director, clearly fall within the meaning of the term "harbor."  To "harbor" does not require an element of hiding, as do to "conceal" or to "shield." *See Webster's New World College Dictionary* (4th Ed. 1999).  If HB 11 § 14(a)(2) required an element of hiding, the Texas Legislature would not have included the word "harbor" in the statute.  *See id.*  To "harbor" includes "to shelter or house." *Webster's New World College Dictionary* (4th Ed. 1999).  Plaintiffs Cruz and Reyes house tenants in their rental homes. ROA.1794; ROA.1802.  Plaintiffs Ryan and the Ozanam Center shelter individuals at Casa RAICES, La Casita, and the Ozanam Center.  ROA.356; ROA.1810.  All Plaintiffs clearly harbor individuals, under the plain meaning of the term "harbor."

Plaintiffs harbor their tenants and residents from "detection," within the broad meaning of the word "detection." "Detection" signifies the concept of "a finding out or being found out: said esp. of what tends to elude notice." *Webster's*

19

*New World College Dictionary* (4th Ed. 1999).  In contrast to this broad concept, HB 11 § 14(a)(1), which precedes the harboring provision challenged here, criminalizes concealment and flight specifically from "a peace officer or special investigator."[7]  Thus, § 14(a)(1) presents an example of how the Texas Legislature expresses its intent to specifically proscribe concealment or flight from the police. HB 11 § 14(a)(2) does not adopt this narrow language; which demonstrates the Legislature's intent that the word "detection" in § 14(a)(2) is used broadly, and is not limited to just detection from police.  *See Tex. Lottery Comm'n*, 325 S.W.3d at 635 ("We presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind."); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 19 (Tex. 2007) ("[W]e must . . . consider the statute as a whole and construe it in a manner which harmonizes all of its various provisions.").  A broad understanding of the word "detection" accords with the plain meaning of "detection" and harmonizes § 14(a)(2) with the narrower language stated in § 14(a)(1).

---

[7] HB 11 § 14(a)(1) provides in full:  "A person commits an offense if the person, with the intent to obtain a pecuniary benefit, knowingly . . . uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to (A) conceal the individual from a peace officer or special investigator; or (B) flee from a person the actor knows is a peace officer or special investigator attempting to lawfully arrest or detain the actor[.]"

20

Plaintiffs harbor their tenants and residents from "detection" because Plaintiffs' actions shield their tenants and residents from notice to authorities or "a finding out" by authorities. *See Webster's New World College Dictionary* (4th Ed. 1999). For example, Plaintiffs Cruz and Reyes do not inquire into their tenants' immigration status and do not report their tenants to immigration authorities when they learn that their tenants are undocumented. ROA.1794–98; ROA.1802–05. Plaintiff Ryan provides shelter to immigrant women and children who are not authorized to be present in the United States and lack lawful immigration status. ROA.357. Plaintiff the Ozanam Center takes in, among others, refugees fleeing violence and individuals who have been deported and re-enter the United States. ROA.1813. Plaintiff the Ozanam Center does not ask shelter residents to prove their immigration status, and it does not report undocumented residents to immigration authorities. ROA.1815.

Plaintiffs have Article III standing because HB 11 § 14(a)(2) proscribes the renting and sheltering activities of Plaintiffs within its plain terms. Accordingly, Plaintiffs are certain that criminal sanctions can be visited upon them. *See Babbitt*, 442 U.S. at 302 (plaintiffs had standing to challenge a state criminal statute, even though criminal penalties "ha[d] not yet been applied and may never be applied," where the statutory provision on its face proscribed plaintiffs' activities and the

State had not disavowed any intention of invoking the criminal penalty provision against plaintiffs); *see also Susan B. Anthony List*, 134 S. Ct. at 2344–45 (concluding that plaintiffs' intended conduct was "arguably proscribed" by the challenged state law, which "sweeps broadly," even despite plaintiffs' failure to confess that they will violate the law); *Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383, 392 (1988) (holding that plaintiffs had standing to assert constitutional challenges to a state law because the statute was directly aimed at plaintiffs, who would have to take significant and costly compliance measures or risk criminal prosecution if their interpretation of the statute was correct.).

### 2.    *The scope of HB 11 is not confined by federal law.*

Federal interpretation of federal law does not control Texas interpretation of Texas law. *See Forte*, 780 F.3d at 277 ("When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply) (quoting *Wright*, 508 F.3d 263, 269); *cf. Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1017 n.9 (9th Cir. 2013) ("The Arizona state courts are not . . . bound by federal interpretations of federal law when interpreting their own state harboring provision."). Instead, as described above, the primary objective of Texas statutory construction is to give effect to the Legislature's intent, which is discerned

primarily from the plain language of the statute.  *See Forte*, 780 F.3d at 277; *Tex. Lottery Comm'n*, 325 S.W.3d at 635.

Furthermore, because HB 11 blends terms from different parts of the federal harboring statute, federal cases interpreting 8 U.S.C. § 1324(a)(1)(A)(iii) do not address the precise statutory language of HB 11.  For example, federal law addresses the offenses of "encourages and induces" and "harbors" in separate provisions.  *See* 8 U.S.C. § 1324(a)(1)(A)(iii)–(iv).  In contrast, HB 11 combines these prohibited acts into one provision:  "(a) A person commits an offense if the person, with the intent to obtain a pecuniary benefit, knowingly . . . (2)  encourages or induces a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection."  HB 11 § 14(a)(2).

Finally, even if federal law did bear on the interpretation of HB 11, what little guidance federal courts provide regarding the meaning of the Texas alien harboring statute bolsters Plaintiffs' claim to standing.  Federal courts struggle to define the reach of "harboring" in the federal statute.[8]  These struggles and conflicting interpretations underscore the reasonable likelihood that Plaintiffs'

---

[8] The federal harboring statute, 8 U.S.C. § 1324(a)(1)(A)(iii), provides: "Any person who knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . shall be punished as provided in subparagraph (B)[.]"

conduct is "arguably . . . proscribed" by the Texas's alien harboring law.  *See Susan B. Anthony List*, 134 S. Ct. at 2344 (quoting *Babbitt*, 442 U.S. at 298).

8 U.S.C. § 1324(a)(1)(A)(iii) makes it a crime to "conceal[], harbor[], or shield[] from detection" an undocumented immigrant.  At least one federal court has interpreted "harbor" to include "both concealment and simple sheltering."  *See United States v. Acosta de Evans*, 531 F.2d 428, 430 (9th Cir. 1976); *see also United States v. Costello*, 666 F.3d 1040, 1050–52 (7th Cir. 2012) (Manion, J., dissenting) (concluding that "harboring" should be given its ordinary meaning to support the conviction of defendant for permitting her undocumented boyfriend to live with her).  The Fifth Circuit has determined that in enacting the federal alien harboring law, Congress "intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . ."  *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 529 (5th Cir. 2013) (en banc) (opinion of Higginson, J.) (quoting *United States v. Rubio–Gonzalez*, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982)).

Although the Fifth Circuit has held that "harboring" under the federal statute "requires making a non-citizen's illegal presence in the United States 'substantially easier or less difficult,'" it has not described the specific acts that make an

24

undocumented immigrant's presence "easier or less difficult" and has never categorically refused to apply the federal harboring statute to landlords or shelters. *See Farmers Branch*, 726 F.3d at 529 n.5 (quoting *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007)).   Certainly, providing a home or shelter to an undocumented immigrant makes the presence of an undocumented immigrant in the United States substantially "easier or less difficult."   Given the federal law's broad prohibition against harboring and multiple interpretations of the law, there is a reasonable probability that Texas courts will interpret the Texas alien harboring law to encompass Plaintiffs' activities.  *See Valle del Sol Inc.*, 732 F.3d at 1017 n.9 (determining that there is a reasonable probability that Arizona courts will interpret the Arizona alien harboring statute broadly to find that an individual violates the Arizona statute when she affords shelter to an undocumented immigrant). Accordingly, Plaintiffs have standing because they engage in conduct arguably proscribed by statute.  *See Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298).

### 3.   *HB 11 does not exempt shelters from liability for immigrant harboring.*

Furthermore, HB 11's legislative history demonstrates that the Legislature intended to include shelters and humanitarian workers within the ambit of the harboring provision in order to provide the greatest amount of latitude to local law

enforcement in investigating and prosecuting immigrant harboring.  On March 18, 2015, the Texas House debated HB 11 and took up a number of amendments that would have exempted shelters from liability for harboring.  The House declined to adopt any of these measures, demonstrating that it was not the State's intent to exempt shelters from the harboring provision.

First, Representative Farias offered an amendment to add the following language to HB 11's harboring provision:  "It is a defense to prosecution for an offense under Subsection (a)(2) that the individual who was encouraged or induced to enter or remain in this country is determined by the United States attorney general to be a refugee, as defined by 8 U.S.C. Section 1101."  Tabled Amendment 24, H.B. 11, 84th Leg., R.S. (2015).[9]  Representative Farias explained that the amendment would protect the individual who is assisting a person who has been brought over or forced into this country by smugglers.  ROA.1906.[10]  He further argued that the Legislature needed "to ensure that the individual who acts in good faith to liberate, safeguard and provide food, shelter or passage for individuals who are potentially eligible for refugee status are free to do so without fear of criminal

---

[9] Available at http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=84R&Bill=HB11.

[10] Video recording available at http://www.house.state.tx.us/video-audio/chamber/84/.

prosecution." ROA.1906.  Representative Farias pointed out that the language of HB 11 made people providing "initial safe harbor and humanitarian aid to these undocumented people . . . liable for criminal prosecution" and that the amendment would "protect those who are seeking to help and protect the refugees into this country seeking safety." ROA.1906.  He also stated: "It is important that we do not discourage humanitarian efforts and good acts by our citizens, religious leaders and organizations." ROA.1906.  The bill sponsor in the House, Representative Bonnen, responded in opposition to exempting humanitarian workers from the harboring provision:  "I think Rep. Farias' amendment is well intended, but when I look out on this floor I see colleagues and friends that are incredibly talented attorneys and if Mr. Farias' amendment went on this bill, I think every individual that was up on charges of smuggling would hire one of our talented friends out here if they were willing and with Mr. Farias' language, they would all become refugees and they would all get off." ROA.1906–07.  Representative Bonnen moved to table the amendment and Representative Farias responded that the intent of the amendment was not to protect criminals but rather to protect individuals who are trying to do the right thing:  "They are just good will, good heart, good religious folks that are helping individuals who are brought to this country forcefully and/or smuggled into this country and are fearing harm from the country

27

that they reside in . . . ."  ROA.1907.  The amendment was tabled by a 106-37 vote of the House members.  ROA.1908.

Second, Representative Walle offered an amendment to add, after "pecuniary benefit" the following language:  "and pursuant to organized criminal activity punishable under Section 71.02."  Tabled Amendment 22, H.B. 11, 84th Leg., R.S. (2015).[11]  Representative Walle explained that his amendment would focus on people who are in the business of smuggling. ROA.1898.  Representative Walle explained that he did not want the harboring provision to target bus or cab drivers or business owners or individuals providing legitimate paid services.  ROA.1898.  The bill sponsor, Representative Bonnen, moved to table the amendment, arguing that the amendment would hinder law enforcement's ability to address smuggling issues.  ROA.1899.  The amendment was tabled by a 112-30 vote of the House members.  ROA.1900.

Third, Representative Walle offered an amendment to provide that the "pecuniary benefit" in the harboring provision would have to be at least $500.

---

[11] Available at http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=84R&Bill=HB11.

Tabled Amendment 21, H.B. 11, 84th Leg., R.S. (2015).[12]  Walle argued that smuggling is a large-scale enterprise and a minimum amount for "pecuniary benefit" would capture the criminals that HB 11 intends to target.  ROA.1894–97.  Representative Bonnen moved to table the amendment, arguing that the amendment would eliminate the ability of local prosecutors to prosecute smuggling and would raise the standard of proof too high.  ROA.1897.  The amendment was tabled by a 120-22 vote of the House members.  ROA.1897.

### C.    Plaintiffs face the credible threat of prosecution.

Plaintiffs meet the injury-in-fact requirement of standing because, in addition to pursuing activities proscribed by HB 11, which subjects them to investigation and prosecution under HB 11, they will suffer additional adverse effects of conducting their business activities under its legal regime, including having to revise their business practices, losing tenants, employees, or volunteers, and suffering diversion of their scarce resources or loss of rental income.  *See Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt*, 442 U.S. at 298); *Am. Booksellers Ass'n*, 484 U.S. at 392.

---

[12] Available at
http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=84R&Bill=HB11.

### 1.     *Plaintiffs Cruz and Reyes face the credible threat of prosecution.*

The activities of Plaintiffs Cruz and Reyes fall squarely within the scope of HB 11 and Plaintiffs have demonstrated "a 'serious [ ] interest [ ]' in acting contrary to a statute." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 n.8 (5th Cir. 2008) (alteration in original) (citations and internal quotations omitted) (quoting *Int'l Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979)) (citations omitted).   Given that HB 11 is currently being enforced, and the probability that Plaintiffs Cruz and Reyes will lose rental income if they adopt measures to try to comply with HB 11, it is apparent, as the district court found, that Plaintiffs Cruz and Reyes face sufficient threats of actual injury. *See Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988).   ROA.2097; ROA.2106.

Plaintiffs Cruz and Reyes have provided and continue to provide shelter to undocumented immigrants by renting them housing; Plaintiffs Cruz and Ryan also plan to do so in the future.   ROA.1794; ROA 1802–03.   Plaintiffs Cruz and Reyes do not ask their tenants to reveal their immigration status but have come to learn their tenants' undocumented status during the term of the leases.   ROA.1794; ROA.1802–03.   Plaintiffs Cruz and Reyes do not evict tenants who reveal that they are undocumented because of their immigration status.   ROA.1794; ROA.1802.

**2.    *Plaintiffs Ryan and the Ozanam Center face the credible threat of prosecution.***

The district court correctly found that Plaintiffs Ryan and the Ozanam Center face the credible threat of prosecution.  ROA.2101; ROA.2106.

Plaintiffs Ryan and the Ozanam Center have established that they provide shelter to undocumented immigrants on an ongoing basis.  ROA.357; ROA.1813. The shelter residents perform work to assist in the day-to-day operation of the shelters, thereby providing a pecuniary benefit.  ROA.357; ROA.1811; ROA.1814. The activities of Plaintiffs Ryan and the Ozanam Center fall squarely within the scope of HB 11, including providing shelter, counsel, food, local transportation, and other services to undocumented immigrants.  ROA.356–57; ROA.1810–13. These activities can be interpreted as furthering the presence of undocumented immigrants in the United States or inducing them to stay in the United States.

Furthermore, Plaintiff Ryan is an immigration lawyer and supervises the offices of RAICES in downtown San Antonio where RAICES attorneys and other staff provide legal services to undocumented immigrant clients pro bono and for reduced fees.  ROA.357.[13]  Plaintiff Ryan's work with undocumented clients in the

---

[13] *See also* State Bar of Tex., Find a Lawyer, Mr. Jonathan Denis Ryan, https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=283588.

RAICES law office, by itself, is sufficient to establish a credible threat of prosecution under the Texas state harboring law. ROA.357. *See, e.g. Ga. Latino Alliance for Human Rights v. Governor of Ga.* [hereinafter *GLAHR*], 691 F.3d 1250, 1264 (11th Cir. 2012) (concluding that immigration lawyer was at risk of prosecution under state harboring law and thus had standing) (citing *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998)). Like the plaintiff lawyer in *GLAHR*, Plaintiff Ryan's work with his immigration clients falls under the activities prohibited by HB 11 as harboring. ROA.357.

### 3.    *Plaintiffs have to take significant and costly compliance measures or risk criminal prosecution.*

As the district court correctly found, all Plaintiffs face costly compliance measures sufficient to establish standing. ROA.2097; ROA.23. The threatened harm to Plaintiff landlords and shelters of having to adopt costly new business procedures, losing income, and diverting scarce resources are sufficient to establish standing even in the absence of threatened criminal prosecution. To establish injury-in-fact, there must be some "threatened or actual injury resulting from the putatively illegal action." *Am. Bookseller Ass'n, Inc.*, 484 U.S. at 392 (internal quotations omitted). That requirement is met where a law is aimed directly at a plaintiff who will have to take significant and costly compliance measures or risk criminal prosecution. *Id.*; *see also Babbitt*, 442 U.S. at 299–300 (plaintiff labor

union had standing to challenge Arizona law regulating union elections as unconstitutionally burdensome even though plaintiff had neither "invoked the Act's election procedures in the past nor [had] they expressed any intention of doing so in the future.").

Plaintiff Ozanam Center will be forced to adopt cumbersome and costly new screening procedures that will drain its limited resources and frustrate its mission of providing shelter and food to the homeless regardless of immigration status. ROA.1815–16. Plaintiff Ryan would be unable to operate Casa RAICES and La Casita because their specific purposes are to provide shelter and other aid to undocumented immigrants. ROA.356.

Plaintiffs Cruz and Reyes would be forced to adopt intrusive and time-consuming new procedures to screen tenants for immigration status that will result in a loss of business from all tenants, including U.S. citizens, lawful permanent resident immigrants and undocumented immigrants. ROA.1764–96; ROA.1803–04. If Plaintiffs Cruz and Reyes start asking their prospective tenants to prove their immigration status, they will lose business income. ROA.1795; ROA.1804. Prospective tenants who are undocumented will be deterred from seeking to rent their properties out of fear that Plaintiffs Cruz and Reyes will reject them as tenants or report them to immigration authorities. ROA.1795; ROA.1804. Even

tenants who are lawful immigrants or U.S. citizens are likely to be offended if asked to prove their immigration status as a condition of renting.  ROA.1795–96.

At Plaintiff Ozanam Center, neither the Director nor the other staff are trained in reviewing immigration paperwork to determine the immigration status of the Center's prospective residents.  ROA.1814–15.  In order to screen out prospective tenants on the basis of immigration status, the Center would have to significantly change the way it does business.  ROA.1815.  In addition to abandoning its mission to serve the needy regardless of immigration status, the Center would have to create new immigration-related screening procedures, add them to its current intake process and possibly hire an immigration lawyer or other expert to review immigration paperwork.  ROA.1814–15.  If the Center starts asking prospective residents to prove their immigration status, the homeless people it serves will be deterred from seeking the Center's help.  ROA.1815.

### D.     Defendant McCraw's affidavit does not alter the scope of HB 11 and does not diminish the threat of enforcement.

Defendant McCraw's affidavit has no impact on Plaintiffs' Article III standing.  The district court asked Defendants for an unequivocal answer from the Texas Attorney General to the question of whether Plaintiffs' conduct falls within the ambit of HB 11 § 14(a)(2).  ROA.2374–78; ROA.2105.  The Texas Attorney General did not respond, despite his statutory authority and obligation to provide

34

opinions on questions affecting the public interest when requested by the Governor or a head of a department of state government. *See* Tex. Gov't Code § 402.042.[14] Instead, Defendant McCraw, one of many thousands of state and local law enforcement officers who enforce HB 11, responded with a cryptic declaration that "DPS officials would not investigate, file criminal charges, or otherwise engage in enforcement activity pursuant to the present version of Section 20.05 of the Texas Penal Code[15] against individuals engaged in such conduct."

Of note, Defendant McCraw pointed to no DPS regulation, internal guidance document, or training material advising DPS officers of limitations to the language of HB 11 or instructing DPS officers to refrain from investigating and arresting landlords and shelter employees for immigrant harboring. The failure of Defendant McCraw to take any steps to carve out the activities of landlords and shelter employees from his officers' enforcement of HB 11 is understandable: neither the plain language of the statute nor an Opinion of the Texas Attorney General circumscribes the scope of HB 11 in this manner, and HB 11's legislative

---

[14] Even had the Attorney General provided an opinion, it would not have been controlling. *See City of Dallas v. Abbott*, 304 S.W.3d 380, 384 (Tex. 2010) (rejecting Attorney General's statutory interpretation).

[15] HB 11 § 14(a)(2) is codified at Texas Penal Code § 20.05(a)(2).

history makes clear that Texas intended businesspeople and humanitarian workers to face liability under the statute.

Furthermore, Defendant McCraw's affidavit does not alter the standing analysis because it does not alter the scope of HB 11 § 14(a)(2) and it does not diminish the threat of enforcement. First, Defendant McCraw lacks any authority to bind state courts to a particular interpretation of HB 11. *See Am. Booksellers Ass'n*, 484 U.S. at 395 (determining plaintiffs' intended conduct was arguably proscribed by statute, despite state Attorney General's statement that the statute did not reach plaintiffs' conduct, because the Attorney General could not bind state courts or local law enforcement authorities). Second, Defendant McCraw did not and could not bind his codefendants or local law enforcement agencies, even were it his intention. *See Susan B. Anthony List*, 134 S. Ct. at 2345 (determining that the threat of future enforcement was substantial because, among other things, enforcement of the challenged state statute was not limited to enforcement by defendants). Defendant McCraw serves at the pleasure of the Texas Public Safety Commission, whose members are appointed by the Governor with the advice and consent of the Texas Senate. *See* Tex. Gov't Code § 411.003(b), .005(a). Defendant McCraw cannot bind his superiors, who are codefendants in this case. Defendant McCraw, likewise, has no authority over county prosecutors or local

law enforcement officers.  *See* Tex. Gov't Code § 411.006(a).  Defendant McCraw did not even bind DPS officials with his statement.  His statement is not an order to DPS agents, and it offers no guidance on how to construe the declaration's phrase "such conduct."

As the district court correctly concluded, Defendant McCraw's hollow statement does not diminish the actual threat to Plaintiffs from the ongoing enforcement of HB 11's harboring provisions.  ROA.2106.

## II.    Plaintiffs Have Established Traceability and Redressability as to Defendant Abbott.

The district court correctly concluded that Plaintiffs have established Article III traceability and redressability as to Defendant Governor Abbott.  ROA.2106–09.  In order for a state official to be a proper defendant in his official capacity, a plaintiff "must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act."  *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Terrebonne Parish NAACP v. Jindal*, No. 14-069-JJB-SCR, 2015 WL 8346468, at *3 (M.D. La. Dec. 8, 2015).

As the chief law enforcement officer of the State of Texas, Defendant Abbott has a direct connection to the enforcement of HB 11's criminal provisions, including HB 11's harboring provisions.  Defendant Abbott not only has a

"particular duty to enforce [HB 11]" but also has "demonstrated [a] willingness to exercise that duty." *See Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001).

First, Defendant Abbott has a direct role in enforcement of the criminal provisions of HB 11. Defendant Abbott appoints the members of and supervises the Texas Public Safety Commission. *See* Tex. Gov't Code §§ 411.003(b), 411.003(d), 411.004(5), 411.006(8), 411.0075(c), 411.0096(a), 411.0096(b)(2); *see also id.* §§ 411.0036(c), 411.012, 411.023. The Commission oversees and adopts rules to carry out the work of DPS, whose state troopers enforce the criminal provisions of HB 11, including its harboring provisions. *See* Tex. Gov't. Code §§ 411.003, 411.004.

Second, Defendant Abbott awards law enforcement grants to state agencies and local governments through his Texas Criminal Justice Division, which funds a variety of grants to law enforcement programs for investigation, enforcement, prosecution, and courts. *See* Tex. Gov't Code § 772.006.[16] Between 2013 and 2014, Defendant Abbott provided $7.9M to the regional councils of governments

---

[16] *See also* Office of the Governor, eGrants Criminal Justice Division, https://egrants.gov.texas.gov/moreinfo.aspx.

in Texas for enforcement training.[17]   In addition to law enforcement training, Defendant Abbott awarded $17.5 million to Texas law enforcement programs.[18] These funds were used in part for support personnel, police cruisers and specialty vehicles, records management systems, interoperable radios, training, and surveillance equipment.[19]

On December 15, 2015, as part of his special duty to enforce the criminal provisions of HB 11, Defendant Abbott announced his award of grants totaling $4.2 million to the Border Prosecution Unit.  ROA.351.  The Border Prosecution Unit was created by HB 11 and is comprised of 17 district and county attorneys within the Texas border region.  ROA.351.  According to Defendant Abbott, the Border Prosecution Unit focuses on cases involving "narcotics, weapons, human trafficking, organized crime, gangs, and other border-related offenses," and, on December 10, 2015, Defendant Abbott and members of the Border Prosecution Unit entered into a Memorandum of Understanding to collaborate and cooperate in the prosecution of border crime.  ROA.354.  In his announcement of funding to the

---

[17] *See* Office of the Governor, Criminal Justice Division, 2013–14 Biennial Report to the 84th Texas Legislature 3 (2014), http://gov.texas.gov/files/cjd/CJD_2013-2014_Biennial_Report.pdf.

[18] *See id.*

[19] *See id.*

Border Prosecution Unit, Defendant Abbott stated "This action would not be necessary if the federal government fulfilled its obligation to secure our nation's border. . .  My first and foremost responsibility as Governor is to protect the citizens of Texas, with or without the federal government's help."  ROA.353.

Also in December 2015, Defendant Abbott announced that he extended the deployment of the National Guard troops in the South Texas and border region. ROA.353.  Defendant Abbott, as the Commander in Chief of the Texas military forces, which includes the Texas National Guard, not only has the authority to deploy National Guard officers, but in fact has done so as part of his enforcement of HB 11.  *See* Tex. Gov't Code §§ 437.001(14), 437.002; ROA.353.

Thus, Defendant Abbott enforces the criminal provisions of HB 11 by directing the deployment of law enforcement officers and awarding grants to support state and local enforcement of HB 11.  He has also expressed a strong willingness to enforce the criminal provisions of HB 11, to fulfill the obligation to enforce immigration laws that he believes the federal government has abdicated.

Defendants cannot analogize this case to ones in which the defendant state official had no connection to the enforcement of the challenged law.  *See, e.g.*, *Fitts v. McGhee*, 172 U.S. 516, 529 (1899) ("It is to be observed that neither the attorney general of Alabama nor the solicitor of the Eleventh judicial circuit of the

40

state appear to have been charged by law with any special duty in connection with the [challenged law]."). For example, Defendants rely heavily on *Okpalobi*, in which the plaintiffs sued the Governor and Attorney General to enjoin a law that gave women who underwent abortions a cause of action against their doctors. *See Okpalobi*, 244 F.3d at 409. The Fifth Circuit concluded that "on its face, [the challenged statute] does not direct the State or its officers to do anything," and thus the Governor and Attorney General were not proper defendants. *Id.* at 417. In contrast, Defendant Abbott has a direct role in awarding grants to fund training and support for state and local officers, and he assigns law enforcement officers to investigate and arrest individuals for violations of HB 11, including its harboring provisions. He is a proper defendant because an order enjoining him from enforcing HB 11's harboring provisions will immediately halt his current activities of deploying and supporting officers to carry out investigations and arrests for violations of the state harboring law. See *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.") (emphasis original); *see also LeBlanc*, 627 F.3d at 123–24 (concluding that official defendants had "definite responsibilities relating to the application of [the challenged statute].").

41

## III.    Plaintiffs Have an Equitable Right of Action.

The district court correctly concluded that Plaintiffs may bring their suit in equity to enjoin unconstitutional official action.  ROA.2109.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).  The Supreme Court has "long held" that federal courts may grant injunctive relief against state officers who are violating, or planning to violate, federal law.  *Id.*; *see Carroll v. Safford*, 44 U.S. 441, 463 (1845) ("in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer."); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 332 (5th Cir. 2005) ("The Supreme Court has repeatedly entertained federal preemption claims seeking injunctive and declaratory relief.") (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); and *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)).

The cause of action to enjoin unconstitutional action as preempted by the Supremacy Clause derives not from the Supremacy Clause itself, but as a "judge-made remedy" sounding in equity.  *Armstrong*, 135 S. Ct. at 1384.  This action can

be asserted against both state and federal officials. *See Armstrong*, 135 S. Ct. at 1384 (citing, among others, *Ex parte Young*, 209 U.S. at 150–51 and *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).[20] Supreme Court precedent provides myriad examples where private parties sue pursuant to this "judge-made remedy" to enjoin unconstitutional action as preempted by the Supremacy Clause. *See, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2260 (2013) (Scalia, J., writing for the majority holding that an Arizona law was preempted in a private party preemption challenge); *Hines v. Davidowitz*, 312 U.S. 52 (1941) (holding a state law preempted in a challenge brought by private parties). Likewise, Fifth Circuit precedent affirms this equitable cause of action. *See, e.g.*, *Farmers Branch*, 726 F.3d at 527 (holding a local ordinance seeking to regulate non-citizens who reside in the United States contrary to law to be preempted in a private-party, pre-enforcement challenge).

---

[20] *Ex Parte Young* provides an example of this equitable cause of action asserted against state officials. The case itself concerned an exception to the Eleventh Amendment bar against suing states in federal courts. *See Ex Parte Young*, 209 U.S. at 155-56; *Okpalobi*, 244 F.3d at 416 (The Supreme Court's decision in *Young,* appraised in the light of its predecessors *Smyth* and *Fitts* and its progeny, is thus properly understood to create a precise exception to the general bar against suing states in federal fora. This exception only applies when the named defendant state officials have *some connection with the enforcement of the act* and "threaten and are about to commence proceedings" to enforce the unconstitutional act."). Accordingly, *Ex Parte Young* should not be read, as Defendants read it, to broadly proscribe limits to the equitable cause of action. *See* Appellants' Br. 29–30.

The Supreme Court in *Armstrong* did not upset this centuries-old private right of action.  Indeed it reaffirmed it.  *See Armstrong*, 135 S. Ct. at 1384 ("What our cases demonstrate is that, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.") (quoting *Carroll v. Safford*, 3 How. 441, 463, 11 L. Ed. 671 (1845)); *Armstrong*, 135 S. Ct. at 1391 (Sotomayor, J., dissenting) ("[E]ven though the Court is correct that it is somewhat misleading to speak of an implied right of action contained in the Supremacy Clause, . . . that does not mean that parties may not enforce the Supremacy Clause by bringing suit to enjoin preempted state action.") (internal quotations omitted).  Thus, the issue in *Armstrong* was not whether a private right of action exists at all—all Justices agreed that one did—but whether that private right had been circumscribed by express or implied statutory limitations.  *See Armstrong*, 135 S. Ct. at 1385.  The Court concluded in *Armstrong* that private enforcement of the Medicaid Act had been precluded by implied limitations in the statute.  *See id*., 135 S. Ct. at 1385–86 ("The dissent agrees with us that the Supremacy Clause does not provide an implied right of action, and that Congress may displace the equitable relief that is traditionally available to enforce federal law.  It disagrees only with our conclusion that such displacement has occurred here.").

44

Unlike in *Armstrong*, Plaintiffs' equitable cause of action has not been displaced by statutory limits. Plaintiffs are not suing to enforce any federal law, unlike the plaintiffs in *Armstrong*. *See id.* at 1382. Plaintiffs, instead, are suing to prohibit the enforcement of a preempted state law, HB 11 § 14(a)(2) and related harboring provisions. Thus, unlike in *Armstrong*, it is immaterial whether a federal statute precludes private enforcement. *See id.* at 1385 (determining that the Medicaid Act implicitly precludes private enforcement). The relevant question here is whether Congress precluded Plaintiffs' challenge to Texas's immigrant harboring law. Congress has not done so by any express or implied statutory language.[21] Therefore, Plaintiffs have a right of action in equity to bring their claims under the Supremacy Clause against Defendants. *See Armstrong*, 135 S. Ct. at 1384.

---

[21] An example of Congressional preclusion of a preemption challenge is found in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 225(a), 122 Stat. 5044, 5072 (2008), codified at 22 U.S.C. § 7101, which provides that federal trafficking laws shall not preempt state criminal laws. Congress did not pass a similar preemption savings clause with respect to alien harboring laws in 8 U.S.C. § 1324 or elsewhere in Title 8. *C.f. Medtronic*, 518 U.S. at 485 (explaining that Congress' intent regarding preemption "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it.") (internal quotations omitted); *Arizona v. United States*, 132 S. Ct. 2492, 2504–05 (2012) ("[T]he existence of an express pre-emption provision does not bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause.") (internal brackets and quotations omitted).

## IV.    Federal Law Preempts HB 11's Harboring Provisions.

The district court correctly concluded that Plaintiffs are likely to succeed on their preemption challenge.    The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."    U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, state law must give way to federal law in at least three circumstances:  (1) where Congress has withdrawn specified powers from the States by enacting a statute containing an express preemption provision ("express preemption"), (2) where Congress, acting within its proper authority, has occupied a field through pervasive regulation or where there is a dominant federal interest ("field preemption"), and (3) where state law conflicts with federal law ("conflict preemption").    *See Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012); *Farmers Branch*, 726 F.3d at 528.    Conflict preemption analysis may overlap and interplay with field preemption analysis.    *Farmers Branch*, 726 F.3d at 544 (Dennis J., concurring) (citing *Hines*, 312 U.S. at 67–68).

HB 11 § 14(a)(2) and the related harboring provisions are field and conflict preempted.

46

## A.     HB 11 § 14(a)(2) is conflict preempted.

As this Court has made clear, conflict is imminent when state actors attempt to concurrently enforce immigrant harboring law through state laws and in state courts. *See Farmers Branch*, 726 F.3d at 528–31; *see also id.* at 549 (Dennis, J., concurring) (concluding that local housing ordinance "infringes on and conflicts with comprehensive and exclusively federal schemes for classifying noncitizens and with enforcing and adjudicating the implications of those federal classifications.").

Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, . . . and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Arizona*, 132 S. Ct. at 2501 (internal quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* (quoting *Crosby v. Nat't Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

HB 11 § 14(a)(2) provides:

A person commits an offense if the person, with the intent to obtain a pecuniary benefit, knowingly . . . encourages or induces a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection.

47

In comparison, 8 U.S.C. § 1324(a)(1)(A)(iii) provides:

> Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . shall be punished as provided in subparagraph (B).

Subparagraph (B) outlines a set of graduated punishments. *See* 8 U.S.C. § 1324(a)(1)(B); *see also Valle del Sol*, 732 F.3d at 1024. Among other terms, clause (i) of subparagraph (B) of the federal statute mandates heightened punishment for violations "done for the purpose of commercial advantage or private financial gain."[22]

### 1. Section 14(a)(2) conflicts with federal alien harboring law by relocating decisionmaking.

As the district court correctly determined, § 14(a)(2) conflicts with federal law by relocating decisionmaking from federal actors to state actors. ROA.2122–25. Under § 14(a)(2), state judges, rather than federal judges, would determine whether an individual "enter[ed] or remain[ed] in this country in violation of

---

[22] HB 11 § 14(a)(2) also pulls in the concept of encouragement and inducement covered by 8 U.S.C. § 1324(a)(1)(A)(iv): "Any person who . . . encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law . . . shall be punished as provided in subparagraph (B)."

federal law." State courts' interpretation of § 14(a)(2) could depart from federal courts' interpretation of 8 U.S.C. § 1324, creating a conflict between Texas and federal jurisdictions. *See Valle del Sol*, 732 F.3d at 1017 n.9 ("The Arizona state courts are not . . . bound by federal interpretations of federal law when interpreting their own state harboring provision.").

Due to the "significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable," Congress has limited state court intervention into immigration law, except in limited, supervised circumstances; § 14(a)(2) would undo this careful balance. *See Farmers Branch*, 726 F.3d at 531 ("[B]y giving state officials authority to act as immigration officers outside the 'limited circumstances' specified by federal law, the Ordinance 'interfere[s] with the careful balance struck by Congress' with respect to the harboring of non-citizens here contrary to law.") (quoting *Arizona*, 132 S. Ct. at 2505–06). To this point, the Fifth Circuit struck down a city's alien harboring ordinance that allowed for state court determinations of immigration status because "[t]he federal government alone . . . has the power to classify non-citizens." *Farmers Branch*, 726 F.3d at 536 (citing *Arizona*, 132 S. Ct. at 2506; D*eCanas v. Bica*, 424 U.S. 351, 354 (1976); and 8 U.S.C. § 1229a(a)(3)).

49

Furthermore, the purpose of § 14(a)(2) is to authorize state and local law enforcement to step into the shoes of federal immigration officers to arrest and prosecute individuals when the federal government declines to do so. ROA.310–11; ROA.340; ROA.614.  Under § 14(a)(2), state actors have the power to arrest and bring charges against individuals "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Arizona*, 132 S. Ct. at 2503 (holding that complementary state law on alien registration conflicted with federal law).

### 2. *Section 14(a)(2) conflicts with federal alien harboring law with respect to penalties.*

"'[C]onflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Farmers Branch*, F.3d at 529 (quoting *Crosby*, 530 U.S. at 380).  Texas law conflicts with federal law, as the district court recognized, by imposing inconsistent and often greater penalties upon violators of its alien harboring law that the federal law does not impose.  *see Arizona*, 132 S. Ct. at 2502 ("Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted;" determining that inconsistent penalties underscored the reasons for field preemption). ROA.2125–27.  Most notably, the Texas harboring law mandates a minimum prison term where the federal law mandates none.  *Compare*  8 U.S.C. §

1324(a)(1)(B)(ii) (providing that a person who violates the federal alien harboring law shall be imprisoned "not more than 5 years"); *id.* § 1324(a)(1)(B)(i) (providing that a person who violates the federal alien harboring law for "the purpose of commercial advantage or private financial gain" shall be imprisoned "not more than 10 years") *with* HB 11 § 14(b) (providing that the state offense of alien harboring is a felony of the third degree); Tex. Penal Code § 12.34 (providing that a felony of the third degree shall be punished by imprisonment for a term of two to 10 years).  The state and federal laws also escalate their penalties differently based on different aggravating factors.  *Compare* 8 U.S.C. § 1324(a)(1)(B) *with* HB 11 § 14(b).

### 3.    *Section 14(a)(2) conflicts with the scope of federal alien harboring law.*

The district court also correctly determined that HB 11 § 14(a)(2) undermines the federal scheme in an additional way—it both widens and narrows the scope of the alien harboring offense.  8 U.S.C. § 1324(a)(1)(C) exempts from prosecution ministers or missionaries of religious denominations, while H.B. 11 § 14 provides no such exemption and would allow prosecution of such individuals. This actual conflict supports a finding of preemption.  *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 899 (2000) (recognizing that "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal

law.") (internal quotations omitted); ROA.2127–29.   Additionally, HB 11 § 14 provides as an affirmative defense that the harbored individual is a relative within the second degree of consanguinity or affinity, while the federal law provides no such defense.  *Compare* 8 U.S.C. § 1324 *with* HB 11 § 14(c).

## B.    Section 14(a)(2) is field preempted.

The district court, drawing on decisions from the Third, Fourth, Ninth, and Eleventh Circuits, also correctly determined that Plaintiffs are likely to succeed on their field preemption challenge.  ROA.2113–2121.

States may not "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

### 1. Congress intended to preempt state alien harboring laws through a complete, harmonious set of standards sanctioning individuals who harbor certain aliens.

Congress has occupied the entire field of alien harboring through a "single integrated and all-embracing system" of criminal sanctions for individuals who harbor aliens who have come to, entered, or remain in the United States in violation of law. *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941).

8 U.S.C. § 1324, titled "Bringing in and harboring certain aliens," includes the federal alien harboring provision of subsection (a)(1)(A)(iii). "In enacting [8 U.S.C. § 1324(a)(1)(A)(iii)], Congress 'intended to broadly proscribe any knowing or willful conduct fairly within any of [its] terms that tends to substantially facilitate an alien's remaining in the United States illegally. . . ." *Farmers Branch*, 726 F.3d at 529 (quoting *Rubio–Gonzalez*, 674 F.2d at 1073 n.5).

Congress calibrated the appropriate breadth of the offense and punishments for alien harboring with the prohibitions, mandates, and procedural rule of § 1324, a section which has been part of the federal government's "extensive and complex" federal immigration scheme for over a century. *Arizona*, 132 S. Ct. at 2499; *see Valle del Sol*, 732 F.3d at 1025. The broad proscription of § 1324(a)(1)(A)(iii) joins with clauses (i), (ii), and (iv) to criminalize bringing an alien into the United States at a place other than a designated entry port, 8 U.S.C. § 1324(a)(1)(A)(i);

53

transporting or moving an unlawfully present alien within the United States, *id.* §

1324(a)(1)(A)(ii); concealing, harboring, or shielding from detection an unlawfully

present alien, *id.* § 1324(a)(1)(A)(iii); and encouraging or inducing an alien to

come to, enter, or reside in the United States, *id.* § 1324(a)(1)(A)(iv).    The

remainder of § 1324 excludes certain religious organizations from the section's

applicability, *id.* § 1324(a)(1)(C); makes it a crime to bring an alien into the United

States knowingly or in reckless disregard of the fact that the alien has not received

prior official authorization, *id.* § 1324(a)(2); and criminalizes repeated hiring of

unauthorized aliens, *id.* § 1324(a)(3).    Additional subsections provide for the

seizure and forfeiture of vehicles used in the commission of an offense, *id.* §

1324(b); allow federal, state, and local law enforcement officers to make arrests for

violations of the section, *id.* § 1324(c); stipulate special evidentiary rules, *id.* §

1324(d); and mandate that the Secretary of Homeland Security shall implement an

educational outreach program, *id.* § 1324(e).

    "Section 1324 is also part of a larger scheme of criminal sanctions for those

who facilitate the unlawful entry, residence, or movement of aliens within the

United States."  *Valle del Sol*, 732 F.3d at 1024; *see also Arizona*, 132 S. Ct. at

2499 (describing interwoven federal immigration provisions); *GLAHR*, 691 F.3d at

1264 ("The [Immigration and Nationality Act] provides a comprehensive

framework to penalize the transportation, concealment, and inducement of unlawfully present aliens."). Among other provisions, 8 U.S.C. § 1182 specifies which categories of aliens may be admitted to the United States; 8 U.S.C. § 1621 makes certain noncitizens ineligible for a range of state and local public benefits; and § 1324a imposes sanctions on employers who hire unauthorized workers. Additionally, aliens themselves may be criminally prosecuted for unlawful entry or reentry into the United States. *See* 8 U.S.C. §§ 1325, 1326.

Congress's "comprehensive and interrelated federal legislative schemes governing the classification of noncitizens, the adjudication of immigration status, and the exclusion and deportation of noncitizens from the United States" indicates Congress's occupation of the entire field of alien harboring regulation. *See Farmers Branch*, 726 F.3d at 544 (Dennis, J., concurring). As with the field of alien registration, Congress occupied the field of alien harboring by "provid[ing] a full set of standards . . . including punishment for noncompliance . . . designed as a 'harmonious whole.'" *Arizona*, 132 S. Ct. at 2502 (holding that Congress occupied the field of alien registration by requiring alien registration, fingerprinting, change of address notification, and the carrying of registration papers and by providing penalties for failure to register) (quoting *Hines*, 312 U.S. at 61); *see also United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013) (concluding that the

55

"vast array of federal laws and regulations" on the subject of alien transporting, concealing, harboring, and sheltering are "so pervasive . . . that Congress left no room for the States to supplement it.") (internal quotations omitted).

In its comprehensive system of criminalization, enforcement, and punishment of alien harboring, Congress specifically determined the appropriate level of involvement for the States. State involvement is limited to arrests for violations of § 1324; state and local officials cannot prosecute or adjudicate alien harboring. *See* 8 U.S.C. § 1324(c); *id.* § 1329 (exclusive federal jurisdiction for causes brought under § 1324); 18 U.S.C. § 3231 (exclusive federal jurisdiction for all offenses under the laws of the United States).

By delineating authority in this manner, Congress left no room for additional state regulation. *See Arizona*, 132 S. Ct. at 2506 (striking down state law providing greater arrest authority over aliens than federal law specifically provided state actors); *see also Valle del Sol*, 732 F.3d at 1025; *GLAHR*, 691 F.3d at 1264 ("In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law."); *cf. Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968, 1970 (2011) (holding that state law allowing suspension of business licenses for the knowing employment of unauthorized aliens fell within the

56

Immigration Reform and Control Act's savings clause, where the Act expressly preempted "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens").

Because Congress has occupied the entire field of alien harboring regulation, Texas's concurrent regulation, allowing co-equal prosecution and adjudication authority, is preempted by the Supremacy Clause. *See Arizona*, 132 S. Ct. at 2502 ("Where Congress occupies an entire field, . . . even complementary state regulation is impermissible.").

Plaintiffs' field preemption claim is not novel, as the district court recognized. ROA.2115. The Third, Fourth, Ninth and Eleventh Circuits, in cases addressing similar statutes in Arizona, Alabama, Georgia, Pennsylvania, and South Carolina, all recently concluded that the federal scheme on harboring is comprehensive and state alien harboring laws are preempted by federal statutes. *See Valle del Sol*, 732 F.3d at 1012; *Lozano v. City of Hazleton*, 724 F.3d 297, 317 (3rd Cir. 2013); *South Carolina*, 720 F.3d at 531-32; *United States v. Alabama*, 691 F.3d 1269, 1288 (11th Cir. 2012); *GLAHR*, 691 F.3d at 1267; ROA.2115–21.

### 2.   *The federal government has a dominant interest in the field of alien harboring that precludes enforcement of state alien harboring laws.*

The breadth of the federal government's alien harboring regulation—including the punishment regime, special evidentiary rules, and placement within the broader alien-regulation framework—underscores the dominant federal interest in alien harboring that leaves no room for state supplementation. *See GLAHR*, 691 F.3d at 1264 ("In enacting [the Immigration and Nationality Act], the federal government has clearly expressed more than a peripheral concern with the entry, movement, and residence of aliens within the United States . . . and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.") (internal quotations omitted); *see also Lozano*, 724 F.3d at 316 (agreeing with *GLAHR*).

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 132 S. Ct. at 2498. "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens

in this country who seek the full protection of its laws. . . .  Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."  *Id.*

By authorizing state actors to decide who is capable of harboring an alien, whether harboring has occurred, and whether an individual should be prosecuted for harboring an alien, H.B. 11 § 14(a)(2) intrudes upon a field of dominant federal concern and is preempted.  *See Arizona*, 132 S. Ct. at 2501.  Section 14(a)(2) violates the principle that prosecution of alien harboring is entrusted to the discretion of the federal government and must be made with one voice in accordance with foreign policy priorities.  *See id.* at 2506–07 (concluding that state law authorizing state officers to detain aliens "violate[d] the principle that the removal process is entrusted to the discretion of the Federal Government" because "[d]ecisions of this nature touch on foreign relations and must be made with one voice"); *see also South Carolina*, 720 F.3d at 530 ("While the federal law authorizes state and local law enforcement officers to make arrests for violations under [§ 1324], prosecution is at the discretion of federal prosecutors and the cases are brought in federal court.").

Alien harboring implicates federal discretion, which is "a principal feature of the [alien] removal system."  *Id.* at 2499.  The federal government creates

immigrant classifications and has the exclusive authority to decide which immigrants are present in the U.S. without authorization. As to those immigrants whom the federal government has determined are present without authorization, federal officials must decide which aliens to detain and which to release pending the outcomes of removal and asylum proceedings. *C.f. id.* ("Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."); *Farmers Branch*, 726 F.3d at 530 ("[F]ederal law not only contemplates a non-citizen's residence in the United States until potential deportation, but also requires the non-citizen to provide a reliable address to the federal government to guarantee and speed the removal process.").

The exercise of the federal government's discretion "embraces immediate human concerns." *Arizona*, 132 S. Ct. at 2499. The equities of an individual harboring case may turn on many factors such as whether the harbored individual has been released from detention, has children born in the United States, or has long ties to the community. *See id.* (explaining the many ways the federal government exercise its discretion in enforcing immigration law).

### C.  Sections 15(a) and 16(a)(17) are preempted to the extent they incorporate § 14(a)(2).

The Court should affirm that HB 11's related immigrant harboring provisions are likely preempted. ROA.2121; ROA.2129. HB 11 §§ 15(a) and

16(a)(17) are offenses that require the commission of an underlying offense, one of which may be the offense created by § 14(a)(2). Sections 15(a) and 16(a)(17) are preempted to the extent that they adopt the Texas alien harboring offense of § 14(a)(2) as an underlying offense for the same reasons that § 14(a)(2) is preempted.

## V.     The District Court Acted Within Its Discretion When It Entered a Preliminary Injunction.

The district court did not abuse its discretion in finding that the equitable factors weighed in favor of granting a preliminary injunction. ROA.2135–37. "While 'the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion.'" *Janvey v. Alguire*, 647 F.3d 585, 591–92 (5th Cir. 2011) (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32 (1975)).

The district court appropriately found a likelihood of irreparable harm to Plaintiffs based on their actual subjection to criminal penalties under Texas's unconstitutional immigrant harboring laws. ROA.2136. It is well settled that the violation of constitutional rights for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction. *See Deerfield*

61

*Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (Former 5th Cir. Unit B Nov. 1981) (citing, among other cases, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Moreover, where state law is likely preempted, as it is here, the likelihood of irreparable injury is implied. *See Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements."); *see also VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), *abrogated on other grounds by Heimann v. Nat'l Elevator Indus. Pension Fund*, 187 F.3d 493 (5th Cir. 1999). Irreparable injury results because Plaintiffs are subject to inconsistent prohibitions after Congress determined that one federal set of standards should apply. *See Trans World Airlines*, 897 F.2d at 784 (explaining that irreparable injury results when state law deprives plaintiffs of the right to have only one regulator); *see also South Carolina*, 720 F.3d at 533 (determining that plaintiffs established a likelihood of irreparable injury because "the likelihood of chaos resulting from South Carolina enforcing its separate immigration regime is apparent"); *GLAHR*, 691 F.3d at 1269 ("Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law, and we

think enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable.").

Likewise, the district court acted within its discretion in determining that the equities favor Plaintiffs. ROA.2163. Plaintiffs face criminal sanctions pursuant to an unconstitutional state statute absent an injunction, while an injunction causes no injury to Defendants, who have no authority to enforce Texas's preempted harboring law. *See Trans World Airlines*, 897 F.2d 784 (determining plaintiffs were likely to succeed on their preemption claim and, consequently, that there was no injury to defendants from an injunction of the preempted state law to weigh against); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation.").

Finally, the district court appropriately concluded that the public's interest is served by preventing enforcement of a law that violates the U.S. Constitution. *See Deerfield Med. Ctr.*, 661 F.2d at 338–39; *Valle del Sol*, 732 F.3d at 1029; *Alabama*, 691 F.3d at 1301; ROA.2136.

## CONCLUSION

The Court should affirm the district court's preliminary injunction.

Dated:  September 12, 2016          Respectfully submitted,

                                    */s/ Nina Perales*
                                    NINA PERALES
                                    MARISA BONO
                                    JACK SALMON
                                    MEXICAN AMERICAN LEGAL DEFENSE
                                    AND EDUCATIONAL FUND
                                    110 Broadway St., Ste. 300
                                    San Antonio, TX 78205
                                    Tel: (210) 224-5476
                                    Fax: (210) 224-5382

                                    *Counsel for Appellees*

## CERTIFICATE OF SERVICE

I hereby that this brief has been served by transmission of copies thereof through the Court's electronic filing system to all registered counsel on this 12th day of September, 2016.  I further certify that:  (1) required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of the corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

                                    */s/ Nina Perales*
                                    Nina Perales

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,925 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(A)(B)(iii). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word (the same program used to calculate the word count) in Times New Roman 14 point type.

*/s/ Nina Perales*
Nina Perales